# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| **LEONA KIRKPATRICK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Cause No. 1:10-cv-1397-WTL-DKL** |
| | ) | |
| **LIBERTY MUTUAL GROUP, INC.,** *et al.*, | ) | |
| | ) | |
| **Defendant.** | ) | |

### ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This cause is before the Court on the parties' cross-motions for summary judgment. The motions are fully briefed, and the Court, being duly advised, **DENIES** the Defendants' motion and **GRANTS** the Plaintiff's motion for the reasons and to the extent set forth below.

## I. STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not

required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

The fact that the parties have filed cross-motions for summary judgment does not alter the standard set forth in Federal Rule of Civil Procedure 56. When evaluating each side's motion, the Court simply "construe[s] all inferences in favor of the party against whom the motion under consideration is made." *Metro Life. Ins. Co. v. Johnson*, 297 F.3d 558, 561-62 (7th Cir. 2002) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

## II. <u>FACTUAL BACKGROUND</u>

Defendant Liberty Mutual Short-Term Disability Plan (the "STD Plan") is an employee welfare benefit plan that provides benefits for eligible employees in the Liberty Mutual Group of companies. The Summary Plan Description ("SPD") for the STD Plan states that the STD Plan "is designed to continue all or part of [your] pay when a non-work-related disability due to sickness or accident prevents [you] from working for more than seven (7) consecutive days and for up to 25 weeks." Benefits are provided by, and are subject to, the STD Plan Formal Plan Document and the SPD.

The STD Formal Plan Document contains a broad reservation of discretionary authority provision for benefit decisions and plan interpretation by the Plan Administrator. Liberty Mutual Insurance Company has delegated final authority for such decisions with respect to benefit claims and appeals to the Group Market Disability Claims department of Liberty Life. Liberty Mutual Group, Inc., is responsible for paying short-term disability benefits from the general assets of Liberty Mutual Group, Inc.

Liberty Mutual Long-Term Disability Plan (the "LTD Plan") is an employee welfare

benefit plan that provides benefits for eligible employees of participating employers. According to the LTD Plan's Summary Plan Description, the LTD Plan is designed to continue a portion of a covered employee's pay when a disability due to injury or sickness keeps the employee away from work for more than twenty-six weeks.

Defendant the Group Disability Income Policy (the "Policy") is part of the LTD Plan. It is a fully-insured policy issued by Liberty Life to Liberty Mutual Group, Inc. that provides long-term disability benefits to eligible participants who, due to injury or sickness, are unable to perform the material and substantial duties of the participants' own occupation, or any occupation, as defined by the Policy and pursuant to all other terms and conditions of the Policy. Under the terms of the LTD policy, Liberty Life has "the authority, in its sole discretion, to construe the terms of [the Policy] and to determine benefit eligibility" under the Policy. Any long-term disability benefits awarded are paid from the general assets of Liberty Life. Thus, Liberty Life acts as both the claim administrator and the insurer relative to an insured's long-term disability claim.

Plaintiff Leona Kirkpatrick is a participant of both the STD Plan and the LTD Plan. Kirkpatrick was employed as a "Claims Specialist I" by Liberty Mutual Insurance Company from December 17, 2007, through December 30, 2010. Prior to her employment with Liberty Mutual Insurance Company, Kirkpatrick was employed as a claims adjuster with Indiana Insurance, a subsidiary company of Liberty Mutual Group, Inc. In total, Kirkpatrick's employment with Liberty Mutual Group, Inc.'s subsidiary companies lasted more than fourteen years.

In her position as Claims Specialist I, Kirkpatrick was responsible for evaluating liability

based on investigation of claims and utilizing the correct workflow in order to ensure that vehicles and property were inspected in a timely and accurate manner. Kirkpatrick's position required constant (defined as 6-plus hours) sitting and intermittent (defined as less than one hour) walking and standing. Keyboarding, telephone use, and keyboarding while on the telephone were also performed constantly. In addition, Kirkpatrick answered customer complaints fifty percent of the time, and her position required her to perform her job activities at a rapid pace one-hundred percent of the time due to a moderate to high volume. Persons performing the job of a Claims Specialist I are subject to a moderate degree of emotional stress during performance of this position.

Kirkpatrick has a complex medical history including a diagnosis of systemic lupus erythematosus ("SLE")[1] in 2008 with severe complex disease including prior renal disease and prior treatment with steroids and Cytoxan. As a result of her SLE, Kirkpatrick experiences periods of joint pain and swelling, muscle pain, stiffness, and fatigue. Kirkpatrick also has diabetes mellitus, and she has a history of life-threatening pulmonary emboli in both lungs.

In August 2007, Kirkpatrick suffered a massive bilateral pulmonary embolism that resulted in a lengthy hospitalization from August 20, 2007, through September 13, 2007, during which time she underwent substantial testing and evaluation. During her hospitalization, Kirkpatrick was evaluated by Dr. Joseph Kwakye, a nephrologist, for proteinuria, or excess

---

[1] Systemic lupus erythematosus is "an inflammatory connective tissue disease of unknown cause that occurs chiefly in women and is characterized especially by fever, skin rash, and arthritis, often by acute hemolytic anemia, by small hemorrhages in the skin and mucous membranes, by inflammation of the pericardium, and in serious cases by involvement of the kidneys and central nervous system." Medline Plus Medical Dictionary, http://www.merriamwebster.com/medlineplus/systemic%20lupus%20erythematosus.

4

protein in the urine. Dr. Kwakye advised that Kirkpatrick likely had nephrotic syndrome[2] and

requested additional testing. Kirkpatrick underwent a biopsy of her right kidney on August 31,

2007. Results of the renal biopsy confirmed membranous glomerulopathy (stage 1-2) and

"[p]rocess effacement, 60%" which was suggestive of lupus nephritis.[3] Further testing also

revealed a positive ANA[4] screen. Kirkpatrick was subsequently prescribed Cytoxan, a

chemotherapy, and prednisone to treat nephrotic syndrome secondary to lupus-related

membranous nephropathy.

Kirkpatrick was also seen for a rheumatology consultation on September 12, 2007, by Dr.

James Ehlich. Although he noted her "propensity to autoimmunity on the basis of her blood

tests," Dr. Ehlich did not suspect active lupus at that time. However, he recommended annual

follow-up testing for lupus.

On June 12, 2008, laboratory testing suggested a diagnosis of lupus. Specifically, the lab

results noted an atypical speckled ANA pattern, which patterns are found in 30-40% of patients

_____

[2] Nephrotic syndrome is "an abnormal condition that is marked especially by deficiency of albumin in the blood and excess excretion of protein in the urine due to altered permeability of the glomerular basement membranes (as from membranous glomerulonephritis, minimal change disease, or diabetes mellitus)." Medline Plus Medical Dictionary, http://www.merriamwebster. com/medlineplus/nephrotic%20syndrome.

[3] Lupus nephritis is "glomerulonephritis associated with [SLE] that is typically characterized by proteinuria and hematuria and that often leads to renal failure." Medline Plus Medical Dictionary,http://www.merriam-webster.com/medlineplus/lupus%20 nephritis.

[4] ANA means Antinuclear Antibody Panel. An ANA is a blood test that looks at antinuclear antibodies, which are substances produced by the immune system that attack the body's own tissues. "Usually, there is no detectable ANA in the blood (negative test). . . . A positive ANA is much more significant if you also have antibodies against the double-stranded form of DNA. ANA does not confirm a diagnosis of [SLE]. However, a lack of ANA makes that diagnosis much less likely." Medline Plus, http://www.nlm.nih.gov/medlineplus/ency/article/ 003535.htm

with SLE. At that time, Kirkpatrick was suffering from lower back pain, ankle swelling and pain, rashes, and joint pain. However, her pain was controlled by medication, and she was able to continue working in her position as a Claims Specialist at Liberty Mutual.

Throughout 2008 and 2009, Kirkpatrick was seen by Dr. Kwakye for treatment of her nephrotic syndrome. Dr. Kwakye attributed Kirkpatrick's history of excessive blood clotting to nephrotic syndrome and lupus-related membranous nephropathy.

In an office visit with Dr. Kwakye in May 2008, Kirkpatrick reported low back pain, but she also reported no lower extremity swelling at that time, nor at several visits in 2009. Kirkpatrick reported musculoskeletal discomfort to her pulmonologist, Dr. Frederick Tolle, who had continued to follow Kirkpatrick following her pulmonary embolism in 2007.

In 2008, Kirkpatrick began treatment with Dr. Steven Neucks, a rheumatologist. Prior to treatment with Dr. Neucks, Kirkpatrick had been treated by Dr. Neucks' medical partner, Dr. Ehlich, since her rheumatology consultation with him during her hospitalization in 2007.

On September 5, 2008, Dr. Neucks reported to Kirkpatrick's primary care physician, Dr. Danyelle Loveless, and nephrologist, Dr. Kwakye, that Kirkpatrick was having considerably more morning stiffness, increased joint pain, and a little joint swelling. He also noted that she had a rash on her back. Dr. Neucks expressed concern that Kirkpatrick was having a flare of lupus.

Late in October 2008, Dr. Tolle remarked that Kirkpatrick had "clinically recovered" from her pulmonary embolus.

At an office visit on January 8, 2009, Kirkpatrick reported burning and discoloration in her ankles to Dr. Neucks. On April 6, 2009, Kirkpatrick reported joint stiffness and painful

ankles. Dr. Neucks reported that Kirkpatrick's condition had remained unchanged since her last office visit.

In September 2009, Kirkpatrick was diagnosed with new onset diabetes following emergency treatment for elevated blood sugar. She was started on prescription Metformin and advised to follow up with her primary care physician, Dr. Loveless.

Kirkpatrick reported periods of muscle stiffness and leg cramps in the fall of 2009. While she denied joint pain and swelling in mid-September 2009, she reported stiffness and cramping during another visit with Dr. Neucks two weeks later. In late October 2009, she again denied joint paint and swelling.

In February 2010, Dr. Loveless ordered a CT scan of Kirkpatrick's chest after she had experienced pain with inspiration for about a week. The chest CT scan found "no evidence for diagnosis of pulmonary embolism," although it noted that she had a history of pulmonary embolism.

In early March 2010, Kirkpatrick again denied joint pain and swelling, but she reported "generalized bodily pain" during a later follow-up visit with her nephrologist, Dr. Kwakye, on March 18, 2010. Dr. Kwakye also noted at this appointment that Kirkpatrick's "nephrotic syndrome has currently resolved" and "[h]er proteinuria has been improving on lisinopril."

On Monday, March 29, 2010, Kirkpatrick was seen by Dr. Neucks. Kirkpatrick reported "a lot of early morning stiffness and noted that she was beginning to miss work because of the physical problems she was having." According to Dr. Neucks, as a result of this discussion and consultation, "we felt that her illness had indeed worsened. . . . At [that] point we felt that the symptoms had overwhelmed the patient and had become significant enough to warrant

disability."

In the office visit note dated March 29, 2010, Kirkpatrick's reported chief complaint was "needs to know correct diagnosis;" however, Dr. Neucks also reported that Kirkpatrick's condition had worsened since her last office visit in September 2009.

Kirkpatrick ceased working[5] and applied for short-term disability benefits on March 31, 2010. During a telephone intake call with Liberty Life, the claim administrator for the STD Plan, Kirkpatrick reported that she had been diagnosed with lupus two years prior and had recently had a flare-up. She further reported that "she has never been out of work for this in the past [and] she has always been able to manage." On April 1, 2010, claims manager Jessie Ouellette entered a claim note that included information about Kirkpatrick's injury, as well as her job title (claims adjuster), job duties (sedentary job, right/left handed), and symptoms (pain all over in her muscles).

During an April 7, 2010, office visit with Dr. Elsayed Aly, whom Kirkpatrick saw for her prior pulmonary embolism, Kirkpatrick reported moderate to severe low back pain and lower extremity pain, which began five months following discontinuation of certain medications. Dr. Aly ordered a skeletal survey for the evaluation of the "new onset" of lower back pain and leg pain.

On April 11, 2010, Dr. Neucks completed an Attending Physician's Assessment of Capacity for Kirkpatrick at the request of Liberty Life. In the Attending Physician Statement, Dr. Neucks identified Kirkpatrick's diagnoses as "Lupus, Soft Tissue Pain, [and] Membranous

---

[5] As this appointment took place with Dr. Neucks on a Monday, Kirkpatrick's last day of work was the preceding Friday, March 26, 2010.

Nephritis." Dr. Neucks reported under the "Physical Capacity" portion of the assessment that Kirkpatrick was capable of "occasional" (up to 2 hours/ day) sitting, driving, light grasping, finger/typing and lifting up to ten pounds. When asked if Kirkpatrick was capable of functioning in an occupational setting full time within the capacities noted, Dr. Neucks answered "no" and further explained, "[patient] has severe complex disease, may not be able to return." Dr. Neucks advised that the most important barrier to preventing Kirkpatrick from returning to work was "unstable medical status." Dr. Neucks verified that his assessment of Kirkpatrick's capacity was based upon his clinical experience, specialty training, diagnostic tests, patient self-reports, his direct observation, and his clinical examinations of Kirkpatrick.

In addition to the Assessment of Capacity report, Dr. Neucks also completed a Restrictions Form on April 11, 2010. Dr. Neucks advised that Kirkpatrick was restricted due to fatigue, stiffness and joint pain, and he imposed restrictions from 3/29/10 to 4/25/10. Dr. Neucks stated that Kirkpatrick's treatment plan included "medications, office visits, lab monitoring and tests as indicated." When asked to indicate what level of work Kirkpatrick was capable of performing occupationally on a full-time basis, Dr. Neucks marked the box indicating sedentary work. Dr. Neucks listed his medical findings supporting his restrictions as "abnormal lab tests, physical exams, joint pain and swelling, positive trigger points, increased pain."

On April 15, 2010, a nurse case manager for Liberty Life, Tammy Scarponi, contacted Dr. Neucks' office regarding Kirkpatrick and spoke with "Kate." Scarponi did not speak with Dr. Neucks directly. In a letter dated April 15, 2010, addressed to Dr. Neucks, Scarponi memorialized her telephone conversation with Kate as follows:

> Per our conversation today, we discussed that exam findings indicate the patient has bony findings, with fullness on the fingers and wrist (swelling not circled).

No decreased ROM, tenderness of the neck and back. We discussed AODM is likely adult onset diabetes mellitus, #3 is illegible, protein decreased, illegible, DX - has not been established, but Kate stated working diagnoses are lupus since she had a positive ANA and positive Sjogrens (anti-inflammatory condition) which we discussed these lab findings are not in our Liberty Mutual file.

I asked what medications your patient is on and Kate stated Neurontin, Lortab, heart medications, Lexapro, Amrix, Plaquinel and Metformin. She states some of these were prescribed by cardiology and PCP.

I asked about work [restrictions and limitations] as capacity form and restriction forms differ,[6] and Kate stated it appears your patient may never return to work. I asked what has been a significant change to support this and she stated she was not sure. I confirmed your patient had not been seen prior to 3/29/10 since 9/28/09. We discussed that Kate will send all available lab work and diagnostic testing.

Scarponi also asked Dr. Neucks the following specific questions, to which he provided the following answers (in italics) on April 19, 2010:

Please indicate specifically what objective findings have changed that support your patient's inability to work. *Increased joint pain, swelling & fatigue [illegible] joint swelling on exam*

Has a definitive diagnosis been established? *Possible lupus*

Please discuss your ongoing treatment plan in regards to medication changes, specific additional diagnostic testing and return to work plan. *Neurontin [and] lortabs for pain control*

Also on April 19, 2010, Liberty Life received additional lab work from Dr. Neucks' office, and Liberty Life obtained medical records from Kirkpatrick's primary care physician, Dr. Loveless, her nephrologist, Dr. Kwakye, and Dr. Aly, who specializes in oncology-hematology. Liberty Life specifically requested the providers' medical records from March 1, 2010, through

---

[6] While Dr. Neuck's Assessment of Capacity form indicated that Kirkpatrick was not capable of functioning in an occupational setting full time, his Restrictions form indicated that she could perform sedentary work on a full-time basis.

the present date, April 19, 2010. Liberty Life did not request records from these physicians prior to March 1, 2010.

On April 21 and 22, 2010, Liberty Life received additional medical records that it had requested, showing Kirkpatrick's history of pulmonary embolism, membranous glomerulonephritis, and musculoskeletal pain. Liberty Life noted Kirkpatrick's moderate to severe low back pain and leg pain. However, Liberty Life concluded that the additional information "notes diagnosis and treatment prior to [date of disability] and would not support current impairment."

Dr. Neucks wrote a letter reviewing Kirkpatrick's disability status to Liberty Mutual on April 26, 2010, in which he noted that Kirkpatrick had reported a number of symptoms, including joint symptoms, neck pain, and low back pain, during her last visit to Dr. Neucks in September 2009. Dr. Neucks explained

> [Kirkpatrick's] last visit was on 3/29/10 at which time a short-term disability was initiated. In review, this patient has lupus with severe complex disease including prior renal disease and prior treatment with steroids and Cytoxan. I will note that at her last visit in September 2009 she noted that she was getting overwhelmed and she had a number of symptoms including joint symptoms, neck pain, and low back pain. Disability was discussed at that time, and if you note on the record it states considering social security disability. When she was seen in March 2010 she continued to have complaints of joint pain and muscle pain. She had a lot of early morning stiffness and noted that she was beginning to miss work because of the physical problems that she was having.
>
> After a consultation and discussion we felt that her illness had indeed worsened. This has manifestations in increasing stiffness, increasing pain, and generalized fatigue as well as joint pain and muscle pain. At this point we felt that the symptoms had overwhelmed the patient and had become significant enough to warrant disability.

On May 7, 2010, Scarponi conducted a file review, concluding that "[a]lthough a lupus diagnosis would support intermittent flares of condition, available medical information fails to

support a significant change of condition around 3/29/10 which would support [restriction and limitations]. Attempts have been made to secure additional information and diagnostic testing which has not been [received]. There are no [restrictions and limitations] from additional providers."

On the morning of May 11, 2010, Kirkpatrick called Liberty Life and spoke with claims manager Ouellette, who informed her that Liberty Life was not able to approve her claim. Ouellette explained why Kirkpatrick's claim was not approved, and Kirkpatrick replied that she would appeal once some updated test results were available. In the afternoon of May 11, 2010, Ouellette entered a claim note in Kirkpatrick's file stating that the existing medical information provided by Kirkpatrick "was not conclusive of [restrictions and limitations] that would prevent [Kirkpatrick] from doing her job duties" and offered a "recommendation" that Liberty Life deny all benefits.

On May 12, 2010, Ouellette requested Kirkpatrick's job description, which was received and added to Kirkpatrick's file notes that same day. Later that day, Liberty Life manager Sharon McKinney entered a claim note agreeing with Ouellette's earlier recommendation that Kirkpatrick's claim be denied. McKinney noted that the medical records "do[ ] not support a severity of impairment to preclude functional capacity."

On May 13, 2010, Liberty Life issued a denial of Kirkpatrick's claim for short-term disability benefits. Liberty Life explained its determination in the letter:

> You submitted a claim for joint and muscle pain with a date of disability as of March 29, 2010.
>
> On April 14, we received a copy of your office treatment notes from Dr. Neuck [sic] your treating rheumatologist. You were seen on April 06, 2010 and March 29, 2010. On March 29, 2010, you were seen for a chief complaint of needing to

know the correct diagnosis with complaints of joint and muscle pain. Severity was not noted. You reported morning stiffness and missing work, brief fever, and ankle swelling which was not noted on exam. The exam findings did not note any neck and back tender points. The impression/treatment plan was blank except notation that your condition had worsened since your last office visit. Note indicated to be off work. The capacity form completed by your provider indicated minimal capacity. The restrictions form completed indicated you had sedentary capacity with a next office visit of April 19, 2010. This form also states your diagnosis is Lupus but this is not reflected in your office treatment notes.

Your file was reviewed by our Clinical Service Unit. To further clarify a few questions we had a fax request was sent to Dr. Neuck [sic]. This fax has specific questions to be answered.

On April 19, 2010, we received lab work from Dr. Neucks office. We also received information which states that you may never return to work again.

On May 4, 2010, we received the fax request back from Dr. Neucks office with the specific questions we had asked. We had asked Dr. Neucks office if there was a definitive diagnosis established and Dr. Neuck [sic] indicated possible lupus. We also asked to indicate specifically what objective findings have changed that would support an inability to work. Dr. Neuck [sic] wrote; increase joint pain, swelling and fatigue.

On May 7, 2010, your file was again reviewed by our Clinical Service Unit. The assessment indicated that although a lupus diagnosis would support intermittent flares of condition, available medical information fails to support a significant change of condition around March 29, 2010, which would support restrictions and limitations. There are no restrictions and limitations from additional providers.

Therefore, in the absence of medical evidence to support a level of impairment that would preclude you from performing the material and substantial duties of your job, you do not meet the definition of disability as stated in [Liberty Life's STD Plan] and no benefits are payable, we must deny your claim for benefits.

On May 12, 2010, Dr. Neucks reported again that Kirkpatrick's condition was worsening. Kirkpatrick reported back pain, and Dr. Neucks noted back spasms upon physical examination.

On May 25, 2010, Kirkpatrick underwent an EMG and nerve conduction study due to pain in her low back with occasional migration into her buttocks and knee. Kirkpatrick reported that sitting, standing, and walking for prolonged periods of time increase her pain. Both the

EMG and nerve conduction studies were within normal limits; however, an exam suggested sacroiliitis might be a cause of the paresthesias in Kirkpatrick's legs.

Kirkpatrick returned to see Dr. Neucks again on May 27, 2010, wherein he reported that her condition remained "unchanged."

Kirkpatrick appealed Liberty Life's denial of her short-term disability claim on June 2, 2010. She included medical records and documentation from her treating physicians, including both past and current medical records, totaling 110 pages, with her appeal.

Following receipt of Kirkpatrick's appeal for short-term disability benefits, Liberty Life entered the following claim note on June 10, 2010:

> Large amount of additional medicals submitted on appeal which confirms the diagnosis of lupus. [Claimant] appeal letter was reviewed in addition to appeal letter from Dr. Neucks who indicate the [claimant] has worsened in her condition with increased stiffness, increased pain and generalized fatigue as well and joint and muscle pain. There are no additional [office visit notes] provided from Dr. Neucks. EMG 5/25/10 was normal. Additional information was submitted by additional providers dating back to 2007. Based on the additional information, the [claimant] has a confirmed lupus diagnosis from medicals dating back to 2007. It is however not clear if a flare of lupus is supported from 3/29/10 ongoing by the clinical findings. Previous attempts have been to clarify conditions with [Attending Physician].

Contrary to Liberty Life's claim note, additional office visit notes from Dr. Neucks for Kirkpatrick for May 12, 2010, and May 27, 2010, were submitted to Liberty Life with Kirkpatrick's appeal.

On June 24, 2010, Kirkpatrick's file was referred to Behavioral Medical for a peer review. On July 9, 2010, Dr. Hal Martens issued his peer review report to Liberty Life. Dr. Martens reported that "his review of the medical record shows that [Kirkpatrick] has been quite stable recently regarding her lupus." Dr. Martens then reports, "There are no progress notes in

the medical record from Dr. Neucks since 9/28/09." Dr. Marten concludes, "Reviewing Dr.

Neucks' physical exam findings from the three progress notes available in the medical record

shows no abnormal joints. There were no swollen joints or tender joints. There was

documentation of neck and back pain."

Dr. Martens reported that his "opinion, after reviewing the medical record, is that

Kirkpatrick has lupus, but it has not been active for quite some time, and the most recent

laboratory and physical exam findings in the medical record would suggest that her lupus is quiet

presently with progress notes documenting normal joint examinations and only some back and

neck pain." Dr. Martens further stated, "Upon review of the medical record, the last

rheumatology note is dated 9/28/09 and as of that date, there is no evidence in the record of

active lupus." He concluded that "there is no reason that [Kirkpatrick] should not be able to

perform a sedentary occupation," although he also noted that "[d]uring a flare-up of lupus,

[Kirkpatrick] may be temporarily unable to perform even a sedentary job." He also explained

this disagreement with Dr. Neucks' assessment:

> Based on review of the medical record, I do not agree with Dr. Neucks'
> assessment that the claimant is totally disabled, as there is no rheumatologic
> evidence in the medical record to substantiate total disability. There is no
> documentation of swelling in joints or abnormal range of motion of joints or even
> any tenderness in peripheral joints, other than some back and neck pain and
> therefore, there is no evidence to support total disability.

On July 21, 2010, Liberty Life upheld its denial of Kirkpatrick's short-term disability

claim, stating that the additional information received on appeal and the file review conducted by

Dr. Martens did not support disability.

On July 26, 2010, Kirkpatrick sent a request to Liberty Mutual for an application

for long-term disability benefits. Kirkpatrick received no response from Liberty Mutual or

Liberty Life.

On August 29, 2010, Dr. Neucks explained in a letter to Liberty Life that Kirkpatrick's impairment or group of impairments prevents her from performing any functions of her job. He did "not believe that combinations will allow the patient to perform gainful employment. One possibility might be to work a substantially limited number of hours such as six to eight hours a week. . . . I do not believe there are attractive alternative accommodations available that would allow [Kirkpatrick] to return to gainful employment."

On September 3, 2010, Kirkpatrick sent another request for an LTD application to the Director of Human Resources for Liberty Mutual Insurance Company, stating: "I have made several requests to have an application for a long term disability benefits mailed to my attention. As of September 3, 2010, I have not received an application nor have I been advised of the process of filing a long term disability claim. Please consider this letter to be my application for long term disability benefits." Kirkpatrick did not include any supporting documentation. Accordingly, on September 15, 2010, Liberty Life entered a claim note indicating that Kirkpatrick had requested to file a long-term disability claim. Liberty Life conducted a phone interview with Kirkpatrick the same day. Kirkpatrick reported her symptoms, medications, attending doctors, and test results, among other information.

Six days later, Liberty Life denied Kirkpatrick's claim for long-term disability benefits because Kirkpatrick " [did] not meet Liberty Mutual's plan definition of disability during the entire Elimination Period."[7] According to Liberty Life, Kirkpatrick was not disabled during the

_____

[7]According to the denial letter, "'[e]limination period' means a period of consecutive days of Disability or Partial Disability for which no benefit is payable. The Elimination Period is shown in the Schedule of Benefits and begins on the first day of Disability. . . . The Elimination

Elimination Period because "the medical documentation provided does not support a significant change in your condition as of March 29, 2010."

On March 18, 2011, Kirkpatrick submitted her appeal of the denial of her long-term disability benefits. In conjunction with her letter of appeal, Kirkpatrick submitted more than 100 pages of supporting documentation, including current medical records from Dr. Neucks from July 9, 2010 (office visit), August 24, 2010 (office visit), August 29, 2010 (narrative report outlining Kirkpatrick's functional impairments), October 20, 2010 (office visit), and December 21, 2010 (office visit). In addition to the current medical records submitted from Dr. Neucks, Kirkpatrick also submitted medical records from her primary care physician, Dr. Loveless, including current medical records that had not been reviewed in conjunction with Kirkpatrick's short-term disability claim.

Dr. Loveless also completed a Physician's Statement of Disability dated February 8, 2011, opining that Kirkpatrick has been unable to perform the material and substantial duties of her own occupation as of March 29, 2010, and was currently disabled from performing any occupation.

On April 8, 2011, Liberty Life employee and Appeal Review Consultant, Lindsay Mack, sent an email to Behavioral Medical, Inc., requesting an addendum to Dr. Martens' July 9, 2010, record review that was conducted during Kirkpatrick's short-term disability claim. Mack wrote:

> Dr. Hal Martens completed a peer review on [Kirkpatrick's] claim on 7/9/10. Twice in the body of his report he noted that there were no progress notes from the treating rheumatologist, Dr. Neucks, since 9/28/09. This is an incorrect

---

period equals the greater of: (a) the end of the Covered Person's Short Term Disability Benefits; or (b) 180 days." Kirkpatrick's date of disability was designated as March 29, 2010; her elimination period was 180 days. Her elimination period ended September 25, 2010.

statement. There were office notes from Dr. Neucks dated 3/29/10 through 5/27/10 and a letter dated 4/26/10 present in the file sent for Dr. Martens' review (as confirmed in the 1st page outline of records – from Rehabilitation Associates of Indiana). Can you please have Dr. Martens provide an addendum addressing these records and any change in his conclusions as a result?

On April 13, 2011, Dr. Martens provided his addendum, stating:

No changes in my previous opinion. Nothing new in the records dated 3/29/2010; 5/12/2010/ 5/25/2010/ or 5/27/2010. These records actually support my previous opinion. There was no significantly abnormal joint exam documented during this period. Also in these records were a negative EMG and CT of the chest. There is no support for active SLE or functional abnormality.

Liberty Life requested MLS Peer Review Services conduct a second record review of Kirkpatrick's claim, which was conducted on April 27, 2011, by Dr. Raymond J. Chagnon. Dr. Chagnon did not examine Kirkpatrick and did not speak with Kirkpatrick or contact any of her treating physicians, but he reviewed extensive medical documentation, including Kirkpatrick's job description, two opinion letters from Dr. Neucks, the Attending Physician Statement and Restrictions form completed by Dr. Neucks, and notes from every office visit to Dr. Neucks since Kirkpatrick's date of disability. Dr. Chagnon concluded, based on his review of Kirkpatrick's medical records, that Kirkpatrick had been capable of working in a full-time sedentary occupation since March 29, 2010.

Dr. Chagnon reviewed Kirkpatrick's impairments and outlined how her impairments translated to restrictions and limitations. He noted that "from 03/29/10 forward, she did have impairments with neck and back pain, and she did have restrictions and limitations" before listing in detail Kirkpatrick's ability to sit, stand, climb stairs, and walk, in addition to other activities. In conclusion, he determined that Kirkpatrick was able to work full-time in a sedentary position from March 29, 2010, forward.

Although Kirkpatrick, through counsel, requested an opportunity to review any medical consultant's report generated during her appeal, Liberty Life refused to provide a copy of Dr. Chagnon's record review prior to issuing its final denial of benefits.

On April 28, 2011, Liberty Life issued its denial of Kirkpatrick's long-term disability claim appeal. The letter explained that two board-certified peer reviewers had concluded, after reviewing the medical records, that Kirkpatrick did not have any restrictions or limitations that prevented her from performing her own sedentary occupation of a claims adjuster. According to a claim note entered by Liberty Life, "The review of the file and the information received on appeal does not offer findings that would alter the previous claim determination."

On November 2, 2010, Kirkpatrick filed her Complaint for the wrongful denial of her short-term disability benefits. Kirkpatrick filed an Amended Complaint on December 15, 2010. On April 27, 2011, an Entry and Order from Status Conference was entered by the Court, vacating the briefing schedule pending a determination on Kirkpatrick's long-term disability application.

Kirkpatrick subsequently filed a Second Amended Complaint against the Defendants on June 1, 2011, to include the wrongful denial of Kirkpatrick's long-term disability benefits. Kirkpatrick and the Defendants now both move for summary judgment.

### III. **<u>DISCUSSION</u>**

Kirkpatrick filed this action pursuant to the applicable provision of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132, seeking the Court's review of the Defendants' decisions to deny her short- and long-term disability benefits. The parties agree that it is appropriate for this Court to review the Defendants' decision under the

arbitrary and capricious, or abuse of discretion, standard[8] because the Plan documents delegate discretionary authority to the plan administrator, Liberty Life, to determine eligibility for benefits.

The arbitrary and capricious standard of review is deferential, of course, but it "is not a euphemism for a rubber-stamp." *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 483 (7th Cir. 2009). The Seventh Circuit has explained that "arbitrary-and-capricious review turns on whether the plan administrator communicated 'specific reasons' for its determination to the claimant, whether the plan administrator afforded the claimant 'an opportunity for full and fair review,' and 'whether there is an absence of reasoning to support the plan administrator's determination.'" *Id.* at 484 (quoting *Leger v. Tribute Co. Long Term Disability Benefit Plan*, 557 F.3d 823, 832-33 (7th Cir. 2009)). In *Majeski*, the court explained that "a plan administrator's procedures are not reasonable if its determination ignores, without explanation, substantial evidence that the claimant has submitted that addresses what the plan itself has defined as the ultimate issue." *Id.*

Kirkpatrick asserts that Liberty Life's initial short-term claim determination, its short-term appeal determination, its initial long-term claim determination, and its long-term appeal determination each were arbitrary and capricious. She argues that each of these determinations was also flawed in that each failed to consider the totality of her medical condition and her

_____

[8]"For ERISA purposes the arbitrary-and-capricious standard is synonymous with abuse of discretion." *Holmstrom v. Metropolitan Life Ins. Co.*, 615 F.3d 758, 767 n.7 (7th Cir. 2010) (citations and quotation marks omitted). While Kirkpatrick takes issue with the Defendants' use of the term "downright unreasonable," the Court is mindful that "the phrase is merely a shorthand expression for a vast body of law applying the arbitrary-and-capricious standard in ways that include focus on procedural regularity, substantive merit, and faithful execution of fiduciary duties." *Id.* at 766 n.5.

chronic pain. Kirkpatrick also contends that there is a structural conflict of interest as to Liberty

Life's determination of Kirkpatrick's long-term benefits because Liberty Life is both plan

administrator and insurer of the long-term disability plan. The Court will address each of these

challenges in turn.

## A. Kirkpatrick's Initial Short-Term Disability Benefit Claim

### 1. The Substantive Merits of Kirkpatrick's Claim

Kirkpatrick argues that Liberty Life's initial short-term benefit determination ignored the

substantive merits of her claim when it disregarded Dr. Neucks' opinion that she was disabled.

In response, the Defendants argue that Liberty Life did not ignore the Dr. Neucks' opinion, but

rather simply reached a different conclusion.

"Bare conclusions are not a rationale." *Love v. Nat'l City Corp. Welfare Benefits Plan*,

574 F.3d 392, 397 (7th Cir. 2009) (citing *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 693 (7th

Cir. 1992)). In making claims determinations, the plan administrator "must provide a reasonable

explanation for its determination and must address any reliable, contrary evidence presented by

the claimant," and it may not simply ignore or dismiss without explanation treating physicians'

medical conclusions. *Love,* 574 F.3d at 397. It is true that the Defendants did not entirely *ignore*

Dr. Neucks' opinion, but it is also true that, in rejecting Dr. Neucks' opinion that Kirkpatrick

was disabled, Liberty Life never *explained* its basis for doing so.[9] Liberty Life specifically

---

[9] The Defendants' Brief and Reply go to great lengths to explain the investigation
pursued by Liberty Life's claim managers. While it may certainly be true that Liberty Life based
its conclusion on a thorough review of Kirkpatrick's medical records, the issue is not whether
Liberty Life did so; rather, the issue is whether it engaged in a rational analysis of the evidence,
formed an opinion founded on a rational basis, and communicated the basis for its conclusions so
as to permit effective appeal and review.

discusses Dr. Neuck's treatment notes, including his capacity form indicating minimal capacity and his restrictions form indicating sedentary capacity, and it then notes what can only be intended to communicate deficiencies in these records, such as "severity was not noted." However, Liberty Life does not address Dr. Neucks' April 26, 2010, letter in which he states that Kirkpatrick has "lupus with severe complex disease including prior renal disease and prior treatment with steroids and Cytoxan" and then clearly explains that "the symptoms had overwhelmed the patient and had become significant enough to warrant disability." In the course of noting the deficiencies in other parts of the Kirkpatrick's medical records – "the exam findings did not note any neck and back tender points" and "This form also states your diagnosis is Lupus but this is not reflected in your office treatment notes" – Liberty Life does not address why the gaps in these records apparently preclude an award of benefits in the face of Dr. Neucks' opinions as stated elsewhere, including his April 26, 2010, letter. Liberty Life indicates that it "received information [from Dr. Neucks] which states that you may never return to work again," but it fails to explain its apparent rejection of this evidence. Furthermore, Liberty Life's ultimate conclusion – "the medical evidence fails to support a significant change of condition around March 29, 2010" – directly contradicts Dr. Neucks' opinion that Kirkpatrick's condition had indeed worsened, but Liberty Life offers no explanation for why it has disregarded the doctor's opinion. In failing to explain why it disregarded Dr. Neucks' opinion at nearly every turn, Liberty Life made a determination apparently devoid of reasoning, and in doing so, it acted arbitrarily.

Liberty Life also erred in its determination, Kirkpatrick argues, because its determination that the evidence fails to support a "significant change of condition" around March 29, 2010, is

inconsistent with the medical evidence. Specifically, Dr. Neucks' April 26, 2010, letter indicates that "we felt that her illness had indeed worsened," but it is not cited by Liberty Life at all. Furthermore, Liberty Life notes in its denial letter that Dr. Neucks' treatment notes indicated that Kirkpatrick's condition had worsened between office visits, and it also explains that Dr. Neucks responded to its request for findings supporting a change of condition that Kirkpatrick experienced "increased joint pain, swelling, and fatigue." However, Liberty Life then concludes that the "available medical information fails to support a significant change of condition," but it does not address the apparent contradiction between this conclusion and the medical evidence and does not explain or even indicate its apparent rejection of Dr. Neucks' treatment records and letters.

Furthermore, Kirkpatrick points out that the fact that she continued to work for two years prior to her last day of work does not necessarily preclude a finding that she is disabled. As the Seventh Circuit explained in *Hawkins v. First Union Corp. Long-Term Disability Plan*:

> The plan's bad argument is that because Hawkins worked between 1993 and 2000 despite his fibromyalgia and there is no indication that his condition worsened over this period, he cannot be disabled. This would be correct were there a logical incompatibility between working full time and being disabled from working full time, but there is not. A desperate person might force himself to work despite an illness that everyone agreed was totally disabling. . . . Yet even a desperate person might not be able to maintain the necessary level of effort indefinitely. . . . A disabled person should not be punished for heroic efforts to work by being held to have forfeited his entitlement to disability benefits should he stop working.

326 F.3d 914, 918 (7th Cir. 2003). The Court agrees. In this respect, Liberty Life's search for a "significant change in condition" indicates that it assumed that Kirkpatrick was not disabled before her last day of work. To the extent Liberty Life made this assumption without explicitly explaining its conclusion or basing its conclusion on the evidence of record, this decision is also

in error.

Kirkpatrick also argues that Liberty Life failed to identify what additional medical information would be needed in order to approve her claim. Pursuant to 29 C.F.R. 2560.503-1(g), a plan administrator must provide a claimant with a notification of an adverse benefit determination setting forth, among other things, "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary." However, because there is no indication that the Defendants required more information to review Kirkpatrick's claim, this section is inapplicable. *See Brehmer v. Inland Steel Industries Pension Plan*, 114 F.3d 656, 661 (7th Cir. 1997) (noting that this section applies only "when more information is needed for a plan administrator to review the denial of a claim").

### 2. Liberty Life's Investigation of Kirkpatrick's Job Requirements

In order to be eligible for short-term disability benefits, the STD Plan requires plan participants to meet the following definition of disability: "the inability to perform all the material and substantial duties of his or her Own Job at his or her pre-disability regular schedule because of Injury or Sickness." "Own Job" means the job that the covered employee was performing when total disability or partial disability began. Kirkpatrick challenges Liberty Life's determination that she was not disabled within the meaning of the STD Plan because, she argues, that determination was made prior to obtaining her job description and assessing whether she was able to perform all the material and substantial duties of her job. In addition, Kirkpatrick argues that Liberty Life undertook no substantive analysis as to whether Kirkpatrick would be precluded by her impairments from performing the material and substantial duties of her job.

The Defendants argue that Kirkpatrick simply distorts the facts: while the claims manager made her recommendation that Liberty Life deny the claim before requesting Kirkpatrick's job description information, the final decision as to Kirkpatrick's claim was not made until after her job description information had been entered into her claim note file and a Liberty Life manager reviewed the file and approved the denial. The Defendants also point out that claims manager Ouellette had entered job information in Kirkpatrick's file on April 1, 2010, indicating that Kirkpatrick's job was a sedentary one, which information "shaped the entire claim assessment."

A plan administrator's review is arbitrary and capricious when the reviewer fails to make reasonable inquiry into the requirements of the claimant's occupation according to its own definitional parameters. *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 476-77 (7th Cir. 1998) (noting that, where plan's definition of "disabled" included evaluation of whether claimant was capable of "engaging in any occupation comparable to that in which he was engaged," reviewer was under duty to make reasonable inquiry into skills claimant possessed and whether those skills may be used at another job that could pay him within same salary range as his previous job).

As a preliminary matter, the Defendants' assertion that the job description entered by Ouellette on April 1 "shaped the entire claim assessment" suggests that Liberty Life failed to adequately review Kirkpatrick's job duties. Notably, the definition of "disabled" under the plan requires an assessment of whether the claimant can perform her "material and substantial duties," but the April 1 claim note simply provides "sed[entary] job, right/left handed," information which can hardly be characterized as illuminating the "material and substantial

duties" of Kirkpatrick's job as a claims specialist. If this information "shaped the entire claim assessment," then the claim assessment proceeded nearly to completion without any information as to Kirkpatrick's job duties at all.

However, the Defendants argue that Liberty Life did later consider Kirkpatrick's job duties, as Ouellette requested the job description form for a Claims Specialist I and entered the information into Kirkpatrick's file. Only after this information was entered and considered, so the Defendants argue, did a Liberty Life manager review Ouellette's recommendation and approve the denial of Kirkpatrick's benefits.

The Defendants' argument ignores the fact that Ouellette told Kirkpatrick that Liberty Life was not able to approve her claim *before* Ouellette even entered the recommendation into Kirkpatrick's claim file, much less before the manager gave "final" approval of Ouellette's recommendation. This fact belies the Defendants' assertion that Ouellette's entry suggesting denial before receiving Kirkpatrick's job description was truly a "recommendation," regardless of the fact that it was labeled as such. Furthermore, even if Ouellette's recommendation was just that and she exceeded her authority in advising Kirkpatrick of the claim denial before final approval, the "recommendation" upon which the Liberty Life manager based her "final" decision was made without the benefit of all necessary information: it made a conclusion that "information that came back was not conclusive of R&L that would prevent [Kirkpatrick] from doing her job duties" before Ouellette even knew what Kirkpatrick's job duties were. In addition, because any substantive "analysis" of job duties conducted by Liberty Life occurred before Ouellette requested documentation of Kirkpatrick's job duties, any "analysis" of Kirkpatrick's job duties is likewise deficient. For these reasons, Liberty Life's decision as to Kirkpatrick's

ability to perform all of her material and substantial job duties was arbitrary and capricious.

## B. Kirkpatrick's Short-Term Disability Benefit Appeal

Kirkpatrick argues that Liberty Life abused its discretion when it selectively relied on Dr. Martens' "faulty record review in favor of the overwhelming evidence of disability provided by Ms. Kirkpatrick's treating physicians." Liberty Life should not have relied on Dr. Martens' opinion, Kirkpatrick argues, because (1) he clearly overlooked key pieces of evidence; (2) he contradicted himself; and (3) he provided no analysis whatsoever as to how Kirkpatrick's disease impacted her ability to perform her own job.

While there is no "treating physician rule" that applies to ERISA cases,[10] a decision to reject a treating physician's opinion must have some rational basis. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) (Plan administrators cannot "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."); *Love,* 574 F.3d at 397 ("The Plan must provide a reasonable explanation for its determination and must address any reliable, contrary evidence presented by the claimant.").

Liberty Life appears to have relied entirely on Dr. Martens' record review in making its determination on Kirkpatrick's appeal, as it cites only from his report in its denial letter. In fact, it does not address any of the extensive contrary evidence of Kirkpatrick's treating physicians'

---

[10] Kirkpatrick and the Defendants engage in lengthy arguments about the reliability and credibility of treating physicians. Just as a treating physician may favor a finding of "disabled," a consultant engaged by a plan may have an "incentive" to make a finding of "not disabled." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003). The Defendants are entitled to consider what possible bias, if any, a treating physician may have. However, because the Defendants in this case have not rejected the treating physician's opinion after considering it, but rather have failed to address it, whether the Defendants were entitled to reject Dr. Neucks' opinion is not at issue.

opinions as submitted by Kirkpatrick in support of her appeal.[11] Furthermore, even in citing Dr.

Martens' report, Liberty Life does not address the contrary evidence presented by Dr. Martens.

For example, Liberty Life does not address Dr. Martens' comment that Kirkpatrick "may be

temporarily unable to perform even a sedentary job," because "Lupus is a very unpredictable

disease, and flare-up can occur unpredictably." Liberty Life's selective readings of the evidence,

even evidence submitted by its own reviewing physician, indeed indicates that its decision on

appeal was arbitrary and capricious.

The deficiency of Liberty Life's appeal review is only compounded on review of Dr.

Martens' report. Indeed, the sole support Liberty Life cites for its decision is itself riddled with

errors and inconsistencies. Dr. Martens repeatedly notes that there are no progress notes from Dr.

Neucks after September 29, 2009, when in fact several key medical records were present,

including Dr. Neucks' April 26, 2010, note explaining Kirkpatrick's continued complaints of

joint pain and muscle pain, her increasing stiffness and pain and generalized fatigue between

September 29, 2009, and March 2010. This key record also includes Dr. Neucks' impression that

_____

[11] While Dr. Martens himself does provide some explanation for his rejection of some of
Dr. Neucks' medical conclusions, Dr. Martens' report was not provided to Kirkpatrick with the
letter denying her appeal. Dr. Martens' report thus does not contribute to the analysis of whether
Liberty Life provided a reasonable basis for its determination to Kirkpatrick, nor whether
Kirkpatrick was afforded enough information to address the determinative issues and have a fair
chance to present her case on review.

It is important to note, however, that while the Defendants argue that Dr. Martens
specifically explained what was lacking in Dr. Neucks' evidence, the letter the Defendants cite
for support indicates that Dr. Martens was perhaps quick to jump to conclusions without waiting
for clarification. Dr. Martens' report indicates that he requested clarification and additional
evidence from Dr. Neucks regarding certain medical records, including the discrepancy in
occupational abilities between Dr. Neucks' Assessment of Capacity form and his Restrictions
form. Yet this written clarification request was sent to Dr. Neucks on July 9, 2010, the same day
that Dr. Martens' issued his "completed" report to Liberty Life. The record does not divulge
whether any response from Dr. Neucks was ever received or considered.

"we felt that her illness had indeed worsened." In overlooking these documents, Dr. Martens formed an opinion without considering evidence of Kirkpatrick's condition in the months immediately preceding her last day of work and thereafter.

Dr. Martens' report also fails to address Kirkpatrick's job duties in any meaningful way. While Dr. Martens lists "job duties" as a document reviewed in preparation of his report, he does not engage in any discussion of the specific duties of Kirkpatrick's occupation other than to state that "there is no reason that [Kirkpatrick] should not be able to perform a sedentary occupation." Furthermore, even this conclusion is only based on rheumatology notes through September 29, 2009, and fails to consider later relevant records by Dr. Neucks with respect to Kirkpatrick's job duties.

Dr. Martens' report is also faulty because it is inconsistent. Dr. Martens opines that Kirkpatrick "may have a problem with sustained capacity to perform a sedentary job because of her lupus," because "Lupus is a highly variable and unpredictable disease, and therefore [Kirkpatrick] may have periods of time where she is incapable of working due to flare-ups in her autoimmune disease process." Yet he later concludes that "there is no evidence to support total disability." Total disability as defined by the Plan requires the inability to perform "all the material and substantial duties of [one's] own job at [her] pre-disability regular schedule." Dr. Martens' comment that Kirkpatrick may have periods of time when she is incapable of working cannot be squared with his conclusion that there is no evidence to support a conclusion that she is unable to perform all her material and substantial duties at her pre-disability regular

schedule.[12]

While Liberty Life argues that any errors in Dr. Martens' report were corrected by his April 13, 2011, addendum, Kirkpatrick argues that even this addendum is incompatible with the medical evidence Dr. Martens reviewed. Specifically, Kirkpatrick points out that the records Dr. Martens reviewed for his addendum indicated pain scores as high as 10, swelling ankles, burning and throbbing in her back, and a generally worsening condition. While it is true, as Dr. Martens explains, that these records do not show abnormal joints, an observation that supports his initial record review, the doctor's summary that there is "nothing new" in these records glosses over the content of the records. Dr. Martens noted in his initial report that there was no swelling of joints, but these records do indicate ankle swelling. Furthermore, these records indicate severe pain and a treating physician's observations that the patient's condition was worsening. At a minimum, Dr. Martens should have acknowledged this contrary evidence and addressed its effect on his initial record review determination. Furthermore, Dr. Martens again completely overlooks Dr. Neuck's April 26, 2010, narrative that explains Kirkpatrick's progression, despite Liberty Life's specific request that he review and address this record in his addendum. In sum, Liberty Life's reliance on a record review report filled with errors and inconsistencies cannot pass muster even on deferential abuse of discretion review.

_____

[12] Liberty Life concluded that Kirkpatrick did not meet the definition of disability because there was an "absence of clinical evidence that supports a level of impairment that would have continuously prevented you from performing the duties of your job." Kirkpatrick argues that this conclusion is contradicted by Dr. Martens' report because Dr. Martens found that Kirkpatrick may at times have a problem with sustained capacity to perform a sedentary job. In making this argument, Kirkpatrick misreads Liberty Life's conclusion to say that Kirkpatrick had the capacity to continuously *perform* her job. This is not the same as Liberty Life's conclusion that Kirkpatrick has not shown that she is continuously *prevented* from performing her job, a conclusion that is not contradicted by Dr. Martens' finding.

## C. Kirkpatrick's Initial Long-Term Disability Benefit Claim

In order to be eligible for benefits under the Group Disability Income Policy, a claimant must meet the following definition of disability:

> i.    if the Covered Person is eligible for the 18 Month Own Occupation benefit, "Disability" or "Disabled" means that during the Elimination Period[13] and the next 18 Months of Disability the Covered Person, as a result of Illness or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and
>
> ii.    thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.

Kirkpatrick argues that Liberty Life's initial long-term benefit determination is arbitrary and capricious because Liberty Life relied solely on the faulty record review that Dr. Martens' completed during Kirkpatrick's short-term benefit appeal. According to the Defendants, this argument is "wholly without merit" because the letter itself demonstrates that Liberty Life carefully reviewed the evidence in the record before denying Kirkpatrick's claim.[14] While Liberty Life's letter certainly describes the medical records of evidence in more detail than the initial short-term benefit denial letter, the majority of this letter reads as a play-by-play of Kirkpatrick's short-term benefit claim and appeal and offers no more explanation for its benefit determination than Kirkpatrick's initial short-term benefit denial letter does. Furthermore,

---

[13] See footnote 7.

[14] The Defendants point out that Kirkpatrick did not submit any additional documentation in support of her long-term disability claim. Yet Kirkpatrick more than once requested the proper paperwork and instructions for filing her long-term disability claim to no avail. When she finally sent a letter asking that Liberty Life deem her letter her application for appeal, Liberty Life then opened the file and initiated a phone call with Kirkpatrick seeking the details of her claim. This telephone call appears to be the only additional information that was gathered before an initial determination regarding the long-term benefits claim was made.

Liberty Life again recites Dr. Martens' findings and cites this report as support for its determination that Kirkpatrick is not totally disabled. However, to the extent that the Court has already found Dr. Martens' review fatally flawed and Liberty Life's reliance on this record an abuse of discretion, Liberty Life's initial long-term benefit claim denial suffers from the same deficiencies.[15]

## D. Kirkpatrick's Long-Term Disability Benefit Appeal

Kirkpatrick argues that Liberty Life's denial of her long-term benefit appeal was unreasonable because it was based on unreliable record reviews; specifically (1) Dr. Martens' supplemental review continued to overlook key evidence; and (2) Dr. Chagnon's record review was deficient because he overlooked key evidence, failed to qualify his rejection of Kirkpatrick's treating physicians' opinions, and conducted no analysis of Kirkpatrick's occupation. The Defendants respond that Kirkpatrick's argument simply distorts the evidence.

While it is true that Dr. Martens performed a supplemental review of the file at Liberty Life's request after it discovered that he overlooked key evidence, Dr. Martens' second record review is nonetheless deficient, as the Court has described above.

In comparison to Dr. Martens' review, Dr. Chagnon's review is certainly more detailed and appears to be more thorough, but it too suffers from critical deficiencies. The Court notes that a reviewing physician is not required to address every single piece of evidence produced by a claimant, *see Davis v. Unum Life Ins. Co. of America*, 444 F.3d 569, 578 (7th Cir. 2006)

_____

[15] Kirkpatrick again argues that Liberty Life failed to identify what additional medical information would be needed in order to approve her claim as required by 29 C.F.R. 2560.503-1(g). As discussed above, this section is inapplicable here because Liberty Life did not require further information in order to review Kirkpatrick's claim.

(explaining that, while the claimant criticized the brevity of the consulting physicians' medical writings and the summary nature of some of their conclusions, reviewing doctors need not draft "lengthy, lawyer-like opinions"), and in this respect Kirkpatrick's argument that Dr. Chagnon did not address certain medical records falls short. However, to the extent that the medical records Dr. Chagnon did not summarize provide key supporting evidence for Kirkpatrick's claim, his failure to address these records, while summarizing others supporting his opinion, is evidence of selective decisionmaking. It is curious that Dr. Chagnon would repeatedly summarize and analyze records from physicians treating Kirkpatrick for diseases other than lupus, especially given Liberty Life's repeated contention that only lupus could serve as a disabling cause for Kirkpatrick's claim, while he does not summarize or appear to analyze in any detail the several medical records from Dr. Neucks, Kirkpatrick's treating rheumatologist, for the relevant time period. The fact that Dr. Chagnon neither summarizes, analyzes, nor provides a basis for his rejection of the contrary evidence presented in these records is evidence of selective and arbitrary decision making.

Furthermore, while concluding that Kirkpatrick is capable of working full-time in a sedentary position, Dr. Chagnon never mentions Dr. Neucks' contrary opinion as outlined in his April 26, 2010, letter, nor does he address why he has rejected this opinion.[16] Finally, just as Dr. Martens fails to address the substantial and material duties of Kirkpatrick's position, so too does Dr. Chagnon. He appropriately provides a much more thorough review of Kirkpatrick's

---

[16] Dr. Chagnon did articulate a reasonable basis for rejecting Dr. Neucks' analysis of Kirkpatrick's cognitive impairment as it pertains to her restrictions and limitations: "it is self-reported, and so there is no medical evidence to validate these impairments, so this reviewer can not give any specific restrictions and limitations based on these non-validated self-reported cognitive impairments."

symptoms and provides a detailed explanation of Kirkpatrick's specific restrictions and limitations,[17] but he never mentions Kirkpatrick's specific duties, nor how her symptoms may restrict those specific duties. Given that Liberty Life determines whether a claimant is disabled during the elimination period by reference to the claimant's own occupation, it was error for Liberty Life to rely on a review that did not consider Kirkpatrick's own occupational duties.

### E. Liberty Life's Consideration of Kirkpatrick's Overall Medical Condition

Finally, Kirkpatrick argues that Liberty Life's reviews of her short- and long-term disability claims were an abuse of discretion because Liberty Life "failed to consider the totality of Ms. Kirkpatrick's medical history and the cumulative effect that her comorbid conditions have on her ability to function in the workforce on a full-time basis." Indeed, throughout the Defendants' Statement of Disputed Facts, they dispute Kirkpatrick's factual statements regarding her pulmonary embolism, diabetes, and nephrotic syndrome, as "neither relevant nor material to the disability claim [Kirkpatrick] filed in 2010 based on lupus." Contrary to their assertions in this Statement, however, the Defendants argue in the body of their Reply that Liberty Life considered these conditions and then determined them to be non-contributing because they were currently resolved or inactive.

A claimant's overall objective medical history is highly relevant in a claim for disability benefits. *Holmstrom*, 615 F.3d at 773. "While the significance of a procedure or a prescription can be disputed, the existence of such things when established in the record can not be," and "a plan administrator must address it and provide a reasonable explanation for discounting it." *Id.*

---

[17] Even Dr. Chagnon's construction of Kirkpatrick's restrictions and limitations are suspect; Dr. Chagnon does not address Dr. Neucks' restrictions at all, much less indicate whether he accepts, rejects, or modifies them.

On initial review, Liberty Life noted Kirkpatrick's medical history, and explained in its internal files that "this information notes diagnosis and treatment prior to [date of disability] and would not support current impairment." Dr. Martens also took note of Kirkpatrick's medical history, and ultimately concluded that "[m]ost of these acute problems were in 2007." Dr. Chagnon similarly considered Kirkpatrick's medical history before remarking that "All of this improved." As these conclusions are adequately supported in the record, the Court finds no infirmity in the degree of review Liberty Life accorded the totality of Kirkpatrick's medical condition.[18]

Kirkpatrick also argues that Liberty Life abused its discretion when it failed to consider the effects of her chronic pain on her ability to perform her job. In response, the Defendants assert that Kirkpatrick's pain was considered, yet the Defendants only point to Dr. Chagnon's consideration of Kirkpatrick's pain. Dr. Chagnon did specifically consider Kirkpatrick's chronic neck and back pain before describing its effect on Kirkpatrick's ability to sit, stand, walk, and perform other daily activities.[19]

The Defendants make no mention of Dr. Martens' report. This is not surprising, as Dr. Martens did not address the possible effects of Kirkpatrick's pain on her restrictions and limitations. What little attention Dr. Martens does pay to Kirkpatrick's pain is incredulous, for in the same sentence where he acknowledges that Kirkpatrick experiences "some back and neck pain," he concludes that "there is no evidence to support total disability." While "a plan may not

---

[18] While the administrative record reveals that Liberty Life did consider Kirkpatrick's other medical conditions, Liberty Life never addressed it or provided a reasonable explanation for discounting it when it issued its denials of Kirkpatrick's claims.

[19] The Court again notes that little discussion of Kirkpatrick's pain was included in Liberty Life's long-term benefit denial letter.

deny benefits solely on the basis that the symptoms of the claimed disability are subjective, a plan may deny benefits because a claimant has failed properly to document pain-induced functional limitations." *Majeski*, 590 F.3d at 485. However, in this case, the issue is not that Dr. Martens has rejected Kirkpatrick's subjective reports of pain, and Dr. Martens does not suggest that he rejects Kirkpatrick's complaints of pain because of a failure to properly document her pain-induced functional limitations; in fact, Dr. Martens appears to accept that Kirkpatrick experiences pain. Rather, the issue is that he did not consider at all how this pain might interfere with her ability to perform her job. In this way, Dr. Martens' report failed to consider relevant aspects of Kirkpatrick's medical condition and rendered an arbitrary opinion upon which Liberty Life relied.

### F. The Appropriate Remedy

Kirkpatrick asks this Court to award her benefits directly rather than remanding for further proceedings. "When a plan administrator fails to provide adequate reasoning for its determination, [the] typical remedy is to remand to the plan administrator for further findings or explanations." *Majeski*, 590 F.3d at 484. A direct award of benefits is appropriate only in "the rare case where the record . . . contains such powerfully persuasive evidence that the only determination the plan administrator could reasonably make is that the claimant is disabled." *Id.* While Kirkpatrick has demonstrated that Liberty Life acted arbitrarily and capriciously, the evidence in the record is not so powerfully persuasive that the only determination the plan administrator could reasonably make is that the claimant is disabled. Accordingly, this case is remanded with the following instructions:

On remand, Liberty Life should conduct a more reasoned inquiry into whether

Kirkpatrick meets the Plans' definitions of "total disability." If it concludes that she does not meet these definitions, it must adequately explain the reasons supporting its decisions, including at a minimum why it is discounting the medical opinions of Kirkpatrick's treating physicians. In addition, Liberty Life should ensure that it considers and addresses Kirkpatrick's physical condition as a whole, including her chronic pain.

## G. Dismissal of Liberty Mutual Group, Inc.

The Defendants move for summary judgment on Kirkpatrick's claims against Liberty Mutual Group, Inc. While Kirkpatrick objects to the Defendants' method, she does not object to the dismissal of Liberty Mutual Group, Inc.

Kirkpatrick's Second Amended Complaint asserts a cause of action for wrongful denial of employee benefits allegedly due pursuant to 29 U.S.C. § 1132(a)(1)(B) against Liberty Mutual Group, Inc., but "ERISA permits suits to recover benefits only against the Plan as an entity." *Neuma, Inc. v. AMP, Inc.*, 259 F.3d 864, 872 n.4 (7th Cir. 2001). Here, the issue is not that there is no genuine issue of material fact as to Kirkpatrick's claim against Liberty Mutual; the issue is that there is no cause of action stated under ERISA as to Liberty Mutual because Liberty Mutual is not one of the plans. Because there is no claim against Liberty Mutual, there is no claim on which to enter summary judgment. Rather, Liberty Mutual is entitled to be dismissed from this action because Kirkpatrick has failed to assert a claim against it upon which relief can be granted.[20] Accordingly, Liberty Mutual Group, Inc., is **DISMISSED** from this action, and the Defendant's motion for summary judgment at to Liberty Mutual Group, Inc. is **DENIED AS**

---

[20]Failure to state a claim upon which relief may be granted is not waived by failing to file a motion to dismiss and may, in fact, be raised as late as trial. Fed. R. Civ. P. 12(h)(2).

**MOOT**.

<h2 style="text-align:center">IV. <u>CONCLUSION</u></h2>

Liberty Life engaged in arbitrary and capricious decisionmaking at nearly every turn.[21] For this reason, the Defendants' motion for summary judgment is **DENIED**, and Kirkpatrick's motion for summary judgment is **GRANTED**. This case is remanded for further proceedings consistent with this Entry.

Defendant Liberty Mutual Group, Inc., is **DISMISSED** from this case, and the Defendants' motion for summary judgment as to Liberty Mutual Group, Inc., is **DENIED AS MOOT**.

SO ORDERED:  03/06/2012

*William T Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.

---

[21] In light of this finding, the Court need not consider the parties' arguments regarding a structural conflict of interest. *See Raybourne v. Cigna Life Ins. Co.*, 576 F.3d 444 (7th Cir. 2009) (conflict of interest "will tip the balance" in favor of claimant in borderline cases).